**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **RUFUS ENGLISH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION 05-0312-WS-B** |
| ) | |
| **CSA EQUIPMENT COMPANY LLC,** ) | |
| ) | |
| **Defendant.** ) | |

**ORDER**

This matter is before the Court on defendant CSA Equipment Company LLC's Motion for Summary Judgment (doc. 45) as well as defendant's Motion to Strike (doc. 60) portions of plaintiff's response in opposition to the Motion. Both Motions have been briefed extensively, and are now ripe for disposition.[1]

**I.      Nature of this Action.**

On May 27, 2005, plaintiff Rufus English filed a Complaint (doc. 1) against CSA Equipment Company LLC ("CSA") alleging that CSA had discriminated against him in employment decisions on the basis of his race (black) and age (60 at the inception of this suit), in violation of Title VII of the Civil Rights Act of 1963, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); 42 U.S.C. § 1981 ("Section 1981"); and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA").[2] In addition to the federal statutory claims, English proffers a state

---

[1]     The Court's task on summary judgment has been complicated by the parties' unfocused submissions. From a garden-variety Title VII case featuring relatively straightforward claims and facts, the parties have managed to produce nearly 110 pages of briefing and in excess of 60 exhibits (totaling more than 500 pages). The net result is a bewildering array of arguments and facts, many of which bear (at best) tangential significance to the issues of concern.

[2]     As originally configured, the Complaint named as an additional defendant International Longshoremen's Association, Local 1459 (the "Union") and brought similar claims against it; however, on April 21, 2006, the Union and English filed a Joint Stipulation (doc. 51) whose purpose and effect was to dismiss plaintiff's claims against the Union with prejudice.

law claim for outrage in which he alleges that CSA's pattern of race and age discrimination constitutes extreme and outrageous conduct which caused him severe emotional distress.

The Complaint is centered on an employment decision in March 2004, wherein CSA passed over English's application for a promotion from an on-call "Free Lance Clerk" position to a full-time "Company Clerk" position.[3]  Although the Complaint also mentions a January 2002 employment decision in which CSA laid off English and another January 2002 employment decision in which CSA re-hired a less senior furloughed white employee without calling back English, a plain reading of the Complaint reflects that those are mere background allegations, and not the basis of any substantive claims.  Numerous passages in the Complaint confirm this construction.  Indeed, the "Preliminary Statement" characterizes this case as a "hybrid hire/promotion case" because English was "an on call replacement worker seeking a permanent position."  (Complaint, at 1.)  This language necessarily excludes the 2002 layoff.  Moreover, in the "Exhaustion of Administrative Remedies" section, English refers only to the 2004 employment decision and his exhaustion of remedies pertaining to same.  (*Id.*, ¶ 5.)  The body of the Complaint discusses the 2004 decision at length, as compared to a single paragraph devoted to the 2002 decisions.  (*Id.*, ¶¶ 17, 26-34.)  Finally, in the causes of action themselves, the Complaint focuses exclusively on the 2004 hiring decision.  (*Id.*, ¶¶ 39-40, 50-51, 61-62, 65.)  Under no reasonable reading does the Complaint state discrimination claims against CSA relating to the January 2002 decisions.

Unfortunately, both parties lose sight of this fact in briefing the Motion for Summary Judgment.  Plaintiff claims that "[i]t is the employment decision to lay him off in the first instance, and the continuing refusal to rehire him, which are the focus of English's plea for relief."  (Plaintiff's Brief (doc. 54), at 2.)  Notwithstanding the liberal pleading standard for civil complaints under Rule 8(a)(2), Fed.R.Civ.P., a brief opposing summary judgment is not a proper

---

(*See* doc. 52.)  Because the Union is no longer a party to this action, the undersigned need not and will not consider English's claims against that defendant, but instead will focus exclusively on those against CSA.

[3]      The parties use the terms "company clerk" and "regular clerk" interchangeably in their filings.  This Order will follow the same convention.

mechanism for amending a complaint.[4]  Had CSA objected to English's *de facto* amendment of the Complaint in his summary judgment opposition brief, this claim likely would have been rejected outright pursuant to the foregoing principles.  Far from objecting, however, CSA echoes plaintiff's description of his claims, which it summarizes as follows: "English claims that CSA released him from his job as a company clerk in January 2002, failed to hire him as CSA's Assistant Chief Clerk shortly thereafter, and failed to hire him as a company clerk in March 2004, ***because of*** his race and age."  (Defendant's Brief (doc. 50), at 17.)  The law is clear that "issues not raised in the pleadings may be treated as if they were properly raised when they are tried by express or implied consent of the parties."  *Steger v. General Elec. Co.*, 318 F.3d 1066, 1077 (11th Cir. 2003); *see also Price v. M&H Valve Co.*, 2006 WL 897231, *11 n.7 (11th Cir. Apr. 7, 2006) (dismissing claim raised by plaintiff for first time in summary judgment opposition brief, but only because defendant objected on that basis).  Defendant's failure to object to the *de facto* amendment of the Complaint to include claims arising from the January 2002 incidents, and its acknowledgment that those claims are at issue in this action, constitutes implied consent to having them be tried in these proceedings; therefore, the *Gilmour/Hurlbert* line of authority is inapplicable, and the Court will consider plaintiff's substantive claims predicated on the 2002 employment decisions, notwithstanding their omission as substantive claims in the Complaint, as well as those arising from the 2004 hiring decision.

## II.    Defendant's Motion to Strike.

At the close of the summary judgment briefing, CSA filed a hotly contested Motion to Strike (doc. 35), in which it sought to excise portions of plaintiff's opposition brief as well as excerpts from plaintiff's declaration.  Because any summary judgment evaluation necessarily hinges on the type and nature of facts in the record and on the arguments that may be considered, and because the Motion to Strike calls into question which facts and arguments are properly

---

[4]    *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (having proceeded through discovery without seeking to amend complaint to reflect new theory of cause of action, plaintiff "was not entitled to raise it in the midst of summary judgment").

before the Court, resolution of that Motion is the appropriate analytical starting point.

### A.     Request to Strike Portions of Plaintiff's Opposition Brief.

Defendant first requests that multiple sections of plaintiff's opposition brief be stricken pursuant to Rule 56(e), Fed.R.Civ.P., and Rules 602 and 802, Fed.R.Evid.  The crux of this component of the Motion to Strike is CSA's disagreement with plaintiff's arguments, in response to which it offers various merits-based counterarguments of its own.  In particular, CSA balks at plaintiff's contention that CSA engaged in a "pattern and practice" of discrimination, and cites legal authorities in support of its position.  Additionally, CSA does not dispute plaintiff's contention that defendant historically hired only white superintendents, but contends that the statement should be stricken anyway because English has established few occasions where blacks applied for those positions and has not shown "the number of superintendent positions filled over the years (a relatively small number), the number of blacks who applied for superintendent jobs, or the comparative qualifications of those who did apply."  (Motion to Strike, at 4.)  Further, CSA challenges as speculative plaintiff's argument that black employees have not been selected as CSA superintendents because CSA has not solicited their applications.  And CSA decries plaintiff's characterizations of its hiring practices concerning African-Americans and plaintiff's theories for the paucity of African-Americans in certain jobs.

There are two insuperable defects with CSA's position.  First, this portion of CSA's Motion to Strike reads like a supplemental merits brief articulating defendant's reasons why the Court should not adopt plaintiff's summary judgment arguments.  But the Court has already received more than 45 pages of merits-based briefing from defendant, and does not require further briefing to elucidate and distill the Rule 56 issues.  To the extent that CSA's Motion merely reiterates defendant's legal arguments presented elsewhere, it is redundant and unhelpful.  To the extent that it offers brand new arguments for why CSA believes its Rule 56 Motion should be granted, the Motion to Strike impermissibly expands the summary judgment briefing beyond the parameters outlined by this Court and will not be entertained.

Second, even if every one of CSA's arguments presented in the Motion to Strike is correct and every one of English's challenged arguments is incorrect, defendant makes no showing why the draconian step of striking plaintiff's arguments is appropriate.  A summary judgment brief is not evidence; rather, it is simply the argument of counsel.  In the overwhelming

majority of cases, the proper judicial response to a factually unsupported or legally defective argument is simply not to credit it.  The Court perceives no reason under the circumstances presented here why the extraordinary measure of striking portions of English's brief might be appropriate.  That defense counsel may disagree with plaintiff's counsel's statements is not a proper justification for a Motion to Strike even if plaintiff's counsel is wrong at every turn.[5] Plaintiff's counsel is entitled to make arguments in his brief, and to present his take on the record evidence.  If a defendant disputes the legitimacy of those arguments or their factual or logical predicate, then its remedy is to file a reply brief (which defendant has done) explaining how plaintiff is in error, not to file a motion seeking to blot the offending arguments from the record. The Court will not strike a portion of the plaintiff's brief simply because an argument expressed therein may suffer from a logical or factual defect.[6]

---

[5]     As a general proposition, material from a summary judgment submission may be stricken in four circumstances.  First, this remedy may be appropriate where material is "redundant, immaterial, impertinent or scandalous," pursuant to Rule 12(f), Fed.R.Civ.P. Striking matter on Rule 12(f) grounds is a drastic, disfavored remedy.  *See, e.g., Sierra Club v. Tri-State Generation and Transmission Ass'n, Inc.*, 173 F.R.D. 275, 285 (D. Colo. 1997) ("Allegations will not be stricken as immaterial under this rule unless they have no possible bearing on the controversy."); *Judicial Watch, Inc. v. U.S. Dept. of Commerce*, 224 F.R.D. 261, 263 (D.D.C. 2004) (matter is "scandalous for the purposes of Rule 12(f) when it ... unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court"); *Poston v. American President Lines, Ltd.*, 452 F. Supp. 568, 570 (S.D. Fla. 1978) ("Motions to strike on the grounds of insufficiency, immateriality, irrelevancy and redundancy are not favored").  Second, an affidavit may be stricken as a sham when it directly contradicts, without explanation, a witness's previous sworn testimony.  *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003).  Third, an affidavit may be stricken when it runs afoul of the requirement that summary judgment affidavits be "made on personal knowledge," that they "set forth facts as would be admissible in evidence," and that they "show affirmatively that the affiant is competent to testify to the matters set forth therein."  Rule 56(e), Fed.R.Civ.P.  Fourth, the Court may strike an affidavit or brief as a sanction for noncompliance with court orders, violations of applicable rules, or other misconduct.  *See, e.g., Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002) ("Courts have the inherent authority to control the proceedings before them, which includes the authority to impose "reasonable and appropriate" sanctions.").  None of these circumstances apply here.

[6]     If the Court were to grant motions to strike in such circumstances, precious few summary judgment briefs (including those submitted by CSA in this case) would emerge

Accordingly, to the extent that the Motion to Strike attacks the summary judgment arguments of plaintiff's counsel, it is **denied** as overreaching and lacking in legal foundation.

**B.      Request to Strike Portions of Plaintiff's Declaration.**

Next, defendant's Motion to Strike seeks to strike no fewer than ten (10) passages from the Declaration of Rufus English (doc. 54, at Exh. D).[7]

First, CSA takes issue with English's statement that "[h]istorically, company clerks have been exclusively white" in the stevedoring industry in the Port of Mobile. (English Decl., at 4.) The Declaration documents a factual basis for this statement, to-wit: English's observations in his 20+ years of experience in the industry. The Court understands that CSA disagrees with English and offers certain elaborating facts; however, CSA's facts do not preclude English from testifying about his experiences and observations. This objection is **overruled**.

Second, CSA objects to English's statement that "I was to learn later that" a white freelance clerk named George Bru had dropped his application for a regular clerk position in 1997 so that CSA's predecessor "would do the right thing and hire [English as] their first black clerk." (English Decl., at 5.) This statement is obviously hearsay and is not subject to any of the exceptions to the prohibition on admissibility of hearsay; besides, the circumstances of English's hiring many years before the events in question in this litigation have no bearing on the factual and legal issues presented on summary judgment. This objection is **sustained** and the cited sentence concerning Bru is **stricken** from the English Declaration.

Third, CSA contests English's characterization of the "custom of the industry" as being that if a company clerk is laid off for lack of business "you would be called back in the order of

---

unscathed and unredacted. Surely no litigant should be silenced simply because his arguments are incorrect, misguided or unpersuasive. In so contending, defendant stretches the motion to strike vehicle well beyond its intended purposes.

[7]      Many of the contested passages relate to collateral matters that are not material to CSA's Motion for Summary Judgment. By instigating a host of evidentiary skirmishes about ancillary issues, movant squanders the resources of both the litigants and the Court for no obvious benefit. Of course, plaintiff shares responsibility for this inefficiency because he chose to include so many peripheral details in English's declaration. The net result is that the Court has before it nearly 35 pages of briefing about a clutch of evidentiary issues, most of which will have no impact on the summary judgment analysis regardless of how they are resolved here.

your company seniority." (English Decl., at 7.)  According to CSA, this statement is hearsay and it conflicts with CSA's evidence.  Again, English had spent more than two decades working in the stevedoring industry in the Port of Mobile, including experience as president of the local union for a time.  Logic and common sense strongly suggest that such experience would give him first-hand insights into the industry customs at the Port of Mobile concerning layoff and recall of company clerks; therefore, while the Court cannot definitively resolve the question at this stage, it appears likely that the challenged testimony can be reduced to admissible form at trial once a bit more predicate is laid.  Moreover, the existence of a discrepancy between English's testimony and that of CSA agents is obviously not a valid basis for striking the former.  This objection is **overruled**.[8]

Fourth, CSA protests English's assertion that he "later learned that CSA claimed that it had laid [him] off during the months of July to September, 2000." (English Decl., at 7.)[9]  A CSA summary judgment filing (that has since been modified) states that English "was laid off sometime before mid-July 2000" and that "sometime before mid-September 20000 ... he returned to his job as a CIS 'company' clerk."  (Doc. 45, Proposed Undisputed Facts and Conclusions of Law, at 4.)  As defendant presents and admits to facts not materially different from the evidence which it seeks to have stricken, this objection is **overruled** as much ado about nothing.[10]

---

[8]     Of course, this point is likely inconsequential.  If English cannot synch up his observations about the industry generally to CSA's practices, and if CSA's evidence is that its practices on this front deviated from those which English ascribes to the industry, then English's testimony about what he saw other stevedoring companies do will have negligible probative value.  Besides, CSA has made no move to strike English's analogous deposition testimony that "[t]here is a past practice that if you only worked for CSA or any other company then you are the first one to get called back."  (English Dep., at 112.)  Hence, this evidence would be considered on summary judgment, irrespective of defendant's objection to this aspect of the declaration.

[9]     English made similar statements during his deposition, wherein he testified that he was laid off as a company clerk "close in time" to when CSA commenced operations. (English Dep., at 66.)  Accordingly, even if the Court were to strike this segment of English's declaration, the same testimony would come in through his deposition excerpt, as to which defendant has lodged no objection.

[10]    Besides, in the next breath after protesting English's assertion that he had been laid off, CSA points to evidence that it had inadvertently excluded English from a July 2000 hiring list and had not added him until shortly before it began operations in mid-September 2000.

Fifth, CSA points to English's contention that he learned that Pam Harper had trained him inadequately on the Clipper Lines account so that CSA would keep her on the job.  (English Decl., at 7-8.)  Plaintiff acknowledges (as he must) that this evidence is rank hearsay and offers no indication that he can reduce it to admissible form at trial.  Accordingly, this objection is **sustained** and the sentence of English's declaration in which he says he "later learned" that Harper was training him incorrectly to secure a job-related benefit for herself is **stricken**.[11]

Sixth, CSA takes issue with English's assertions that another employee, John Hayes, was called back as Assistant Chief Clerk in January 2002, that the Assistant Chief Clerk job had never previously been filled because there was no need to fill it, that English was not considered for the position, and that industry custom directed that he should have been offered the job. (English Decl., at 8.)  CSA's semantic quibble with English's use of the term "called back" rather than "rehired" (CSA's preferred term) just three days after being laid off is not a colorable basis for striking the testimony.  CSA's objection to English's reference to industry custom is likewise unfounded given his extensive first-hand experience and observations in that industry.[12] And certainly English can testify that, to the best of his knowledge, the Assistant Chief Clerk position had lain vacant for some time, that he was aware of no need to fill it, and that he was

---

(Motion to Strike, at 7-8.)  The terminology may be slightly different, but the fundamental point remains the same, namely, that English was not initially identified for hire as a company clerk at the time of the CSA transition in summer 2000.

[11]    Again, however, this statement would have no conceivable impact on the summary judgment analysis even if it were considered.  English has presented evidence of inadequacies in his training by Harper.  That evidence suffices to make his point as to why he may have had problems in performing work on the Clipper Lines account in 2001.  What English may have heard about Harper's allegedly selfish motivations has no visible nexus to the issues at hand, such that both English's reason for making the allegation and CSA's basis for attacking it are a mystery to the undersigned.

[12]    It is also a trivial point, given that testimony about what is customary in the industry is unhelpful without evidence that CSA was bound by, abided by or adhered to such customs.  It is evidence concerning CSA's practices, and not testimony about what others in the industry may have done, that is significant for summary judgment purposes.

never approached about the job.[13]  This multi-part objection reads far too much into English's statement and is **overruled**.

Seventh, CSA challenges English's statement that the Union did not approve of Hayes' hiring as Assistant Chief Clerk because the Union acts only through its membership or its Executive Committee.  (English Decl., at 9.)  Although CSA maintains that English is not competent to testify about this matter, surely a veteran Union member and past Union president can testify as to his understanding of what steps the Union must follow to approve a hiring, and his understanding of whether those steps were followed in a particular case.  Besides, there is abundant record evidence as to the Union's actions before Hayes received the Assistant Chief Clerk position.  Such evidence is generally consistent with English's understanding, so CSA's dissatisfaction with this aspect of the English Declaration will not meaningfully impact the summary judgment record.  (*See* Bowden Dep., at 94-97.)  This objection is **overruled**.

Eighth, CSA invokes the "sham affidavit" rule to attack English's statement that he first learned on April 12, 2004 that the company clerk positions for which he had applied had been filled by Forrest duBruyne and Gerry Givens.[14]  *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) ("Under the law of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony.").  According to CSA, this portion of English's declaration "contradicts [his] unambiguous deposition testimony ..., his sworn answers to interrogatories ..., and his own written grievance, all of which state that English was told by Union Vice President Hayes on April 9, 2004 that duBruyne and Givens had been hired."

---

[13]     The limitations of English's first-hand knowledge on these points are obvious. Thus, if CSA wishes to present evidence of valid reasons (which were not shared with English) for filling the Assistant Chief Clerk job at that time, or evidence that English was in fact considered for the job (but was not so informed), that evidence could properly be weighed on summary judgment because it would not conflict with English's statement, which is confined to information within his grasp.

[14]     The exact date on which English received such notice is of potentially critical importance for the application of the 180-day limitations period to his ADEA and Title VII claims arising out of the 2004 promotion decision.  As such, this aspect of the Motion to Strike actually does address a matter of some consequence to the summary judgment analysis.

(Motion to Strike, at 9.)  In fact, however, <u>none</u> of those items so state.  In the cited deposition
excerpt, English directly addressed this issue as follows:

> "Q:     Was it subsequent to April 9th that you learned that Mr. Given had been hired
>          over you?
>
> "A:     Subsequent to the 9th?
>
> "Q:     Yes.
>
> "A:     ***It was somewhere around the 9th that I learned that.***"

(English Dep., at 285 (emphasis added).)  Given this equivocal exchange, the Court cannot agree
with CSA that this testimony unambiguously states that he received this information on exactly
April 9.[15]  And the answers to interrogatories merely state that English learned of the hiring
decision "[s]everal days after [he] placed [his] application for either of the two positions."
(English Interrog. Resp., at #7.)  Such an amorphous reference could apply to April 12 just as
easily as it could to April 9.  Finally, the grievance itself is an unsworn document listing the date
April 19, which is crossed out and replaced with April 12, which is crossed out and replaced
with April 9.  It is obviously not a clear, unambiguous sworn statement, as might trigger the
sham affidavit rule.  In short, CSA overstates the facts by a substantial margin in characterizing
the April 12 date in English's declaration as "contradict[ing], without explanation, previously

---

[15]     Another portion of English's deposition which CSA cites in support of its "sham
affidavit" argument consists of a compound question and an ambiguous one-word response, to-
wit:

> "Q:     Okay.  So it is a correct statement, it was brought to your attention on Friday,
>          April 9th, that CSA Equipment had made the selection of the two company clerks,
>          and it goes on to complain both – you believe your race and age played a part,
>          right?
>
> "A:     Uh-huh (indicates affirmative)."

(English Dep., at 213-14.)  It appears that English response refers to his belief that race and age
played a part, not to the April 9 date.  In that same excerpt, English confirms that his written
grievance was changed to reflect a date of April 9, rather than April 19, on which he learned of
the hiring decision "[t]o correct that, yes."  (*Id.* at 214.)  But he was never directly asked in that
excerpt whether April 9 was in fact the date on which he received that information.  Thus, there
is no contradiction between this testimony and the Declaration.

given clear testimony." (Motion to Strike, at 9.)[16]  It does no such thing.  Defendant's "sham affidavit" objection is unfounded and is therefore **overruled**.

Ninth, CSA objects to a statement in the English Declaration that English did not believe Givens was on the call out list, that he concluded Givens could have been selected over him only if race discrimination was at work, and that he assumed CSA wanted to keep the clerk staff all white.  (English Decl., at 9.)   Statements of speculation or personal belief are generally not proper and are not considered on summary judgment.  *See, e.g., Pace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002) ("an affidavit stating only that the affiant 'believes' a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact"); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("For factual issues to be considered genuine, they must have a real basis in the record."); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999) (explaining that statements that are conclusory or based on conjecture do not satisfy Rule 56(e)).  These statements plainly fall within the zone of evidence proscribed by these authorities; therefore, the objection is **sustained** and the three sentences on page 9 of the English Declaration beginning with phrase "I didn't believe" and ending with "company all white" are **stricken**.[17]

---

[16]       In so concluding, the Court notes that other documents in the record that long predate English's deposition testimony in this case lend support to the April 12 date.  On November 1, 2004, for instance, English signed an EEOC Charge of Discrimination declaring under penalty of perjury that "On April 12, 2004, I learned that I was not hired for either of the two positions."  (English Dep., at Exh. 19.)  English's deposition in this matter was not taken until December 6, 2005.  In another affidavit dated August 23, 2004, English averred that "[o]n about April 9, 2004, I learned that the Employer had filled two Company Clerk positions." (English Decl., at Exh. 2.)  The "about" modifier provides just enough ambiguity to prevent English's declaration from being contradictory on this point.  To make matters even more confusing, plaintiff's counsel inaccurately characterizes the August 2004 affidavit as stating that "he first learned during the week of April 12, 2004 that he had not been given the position." (Plaintiff's Response (doc. 62), at 21.)  Certainly there are enough layers of ambiguity and confusion as to the actual date of notice that English's present averment as to the April 12 notice date cannot be stricken out of hand.

[17]       That said, this ruling in no way affects the summary judgment analysis.  Plaintiff did not purport to rely on the challenged statements of belief and assumptions as substantive evidence of discrimination, but rather included them simply as background.  Therefore, this exclusion neither advantages CSA nor disadvantages English in any material respect.

Tenth, and finally, CSA insists that English must be speculating when he testifies that certain CSA managers could not have observed his performance because they were housed in a building located a mile from the docks where English worked and they never came down to the docks to observe his work.  (English Decl., at 10.)  It is certainly not conjecture for English to testify to his understanding of where the managers' offices were located, how far that building was from the docks, and whether he ever saw the managers at the docks while he was working. This objection is **overruled**.[18]

III.     **Background Facts.**[19]

   A.     *Plaintiff's Employment History in the Stevedoring Industry until 1997.*

In 1980, plaintiff Rufus English began working as a "freelance clerk" for various stevedoring companies at the Alabama State Docks at the Port of Mobile, Alabama.  (English Decl., at 2.)[20]  In that capacity, he did not work full-time at the docks; rather, his name was on a "call out" list and he was contacted from time to time to perform clerking work for the stevedoring companies.  (*Id.*; English Dep., at 31, 34.)  Freelance clerks are essentially day laborers who are called out in order of seniority on a day-to-day, as-needed basis; by contrast, company clerks are regular full-time employees who perform similar duties as freelance clerks, but who have steady work with a particular company.  (English Decl., at 4.)  In performing this work, English became a member of International Longshoreman's Association, Local Union 1459 (the "Union"), which represents "clerks and checkers" and which had collective bargaining

---

[18]     Of course, English's testimony on this point is bounded by the limitations of his own personal knowledge.  That English did not see the managers does not necessarily mean that they were never there or that they never observed his work.  If the CSA managers testify that they personally observed English's job performance, nothing in English's declaration would categorically refute such evidence or preclude its consideration on summary judgment.

[19]     The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1217 (11th Cir. 2005).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in his favor.

[20]     "Stevedoring" includes loading and unloading of ocean-going vessels and barges; loading and unloading of cargo to and from railroad cars and trucks; checking and accounting for cargo; and placing, checking and accounting for cargo in warehouse space.  (Wilkins Decl., ¶ 3.)

agreements in place with various stevedoring companies during the time period at issue. (English Dep., at 30; Wilkins Decl., ¶¶ 2, 4.)  At particular times, English held positions of leadership within the Union, including the offices of secretary, treasurer, and president.  (English Dep., at 34-35.)

Freelance clerks typically perform duties that involve checking or tallying cargo that is loaded or unloaded from vessels, delivered by or received from carriers, or placed in warehouses.  (Wilkins Decl., ¶ 12.)  Sometimes freelance clerks will be assigned to "bookman/clerk-in-charge" duties, which involve additional responsibilities in excess of checker work, including completion of paperwork and direction of other clerks in the loading or unloading of a vessel.  (*Id.*)  English's freelance clerk assignments gradually increased and he was assigned to work as "bookman/clerk-in-charge" from time to time.  (English Decl., at 2-3.)[21]

From the late 1980s through 1997, English worked a variety of clerking jobs at the docks. The record reflects that he served as assistant bookman or bookman for several vessels during this period, and that he worked as checker or bookman/clerk-in-charge on numerous piers at the Port of Mobile.  (English Decl., at 3.)  As succinctly stated by English, "[t]here is no non administrative clerking job on the pier that [he has] not performed."  (*Id.*)  English frequently performed bookman/clerk-in-charge duties during the 1990s.  (Costell Decl., ¶ 7.)  In completing these duties, English never lost, damaged or misallocated cargo, and was never disciplined or warned for poor job performance.  (English Decl., at 4.)

**B.  English's Work History from 1997 to 2002.**

In February 1997, English was hired into a full-time job of company clerk (effectively a promotion from the on-call freelance position he had held previously) by Cooper/T. Smith Stevedoring Co., Inc. ("CTS"), which was a predecessor of defendant CSA Equipment

---

[21]      English described bookman duties as including responsibility for overseeing pier operations; determining how many clerks were needed; assigning tasks to clerks and supervising their work in both vessel and terminal duties; communicating with cargo suppliers, shipping line personnel and shipping line agents; laying out warehouse space; and tracking and maintaining cargo inventory via computer.  (English Decl., at 3.)  That said, English characterized bookman work as "not complicated" and stated that it "requires little more than a high school education and the ability to read and impute [*sic*] data into a computer."  (*Id.* at 4.)

Company, LLC ("CSA").  (English Dep., at 63; English Decl., at 4; Wilkins Decl., ¶ 1.)[22]
English, who at that time was the Union president, was the first black company clerk hired by
CTS, and prior to that time there were no black company clerks working for any of the Mobile
stevedoring companies, to the best of English's knowledge.  (English Decl., at 4-5.)[23]  As a
company clerk for CTS, English booked ships approximately once every two weeks, just as
CTS's other company clerks did.  (*Id.* at 5.)  This working arrangement continued in largely
uninterrupted fashion until mid-2000.  (*Id.* at 5-6; English Dep., at 63.)[24]

---

[22]        The record reflects that CSA was formed as a limited liability corporation in
1999, that CTS and Stevedoring Services of America ("SSA") each own 50% of CSA, and that
CTS and SSA had previously performed unionized stevedoring work at the Port of Mobile in
their own names.  (Wilkins Decl., ¶ 1.)  CSA was the product of a merger or joint venture
between CTS and SSA.  (English Dep., at 88.)

[23]        This testimony was corroborated by several sources.  A 38-year veteran clerk in
the Port of Mobile averred that "English is the only African American that [he] observed
working as Regular Clerk for any of the of the stevedoring companies doing business in the Port
of Mobile."  (Costell Decl., ¶ 7.)  Likewise, CSA Stevedoring Division Operations Manager
Bobby Smith testified that in the course of his involvement with certain predecessors of CSA
(namely, SSA and Ryan Walsh), he did not recall those companies ever hiring a black company
clerk in Mobile.  (Smith Dep., at 53.)  Smith also indicated that it "probably is the case" that
CSA had never had a black company clerk other than English, and that CTS and SSA had never
had black company clerks.  (*Id.* at 202.)  Incidentally, plaintiff's copy of the Smith deposition
transcript is markedly different than defendant's, and includes numerous typographical errors
and formatting problems.  To avoid such distracting and potentially confusing errors, plaintiff's
counsel is cautioned to use only official transcripts as exhibits in filings before this Court.  More
generally, myriad exhibits submitted by plaintiff have been scanned inaccurately, with the result
that numerous seemingly random discrepancies arise between the original document and the
exhibit submitted.  (*Compare, e.g.*, Plaintiff's Exh. F to English Dep. Exh. 6 or Plaintiff's Exh.
D, at Exh. 1 to English Dep. Exh. 15; *see also* Plaintiffs' Exhs. B, G, H, I, K, M, O, P, etc.)  As
one of countless examples, the letterhead on Plaintiff's Exhibit I includes such names as
"CMAB1-E5 J. Fleming" and "Canois X, Mcsdwan E QL3EN'."  Many of plaintiff's exhibits
are replete with obvious errors apparently caused by his scanning methodology.  Summary
judgment exhibits must be exact copies of the documents in question, not copies that have been
scrambled into incomprehensibility by a flawed reproduction or scanning technology.  Plaintiff's
counsel must implement whatever changes are necessary with his office technology to ensure
that these types of problems do not mar future filings.

[24]        English was nominally laid off from his company clerk job by CTS for a time in
early 2000; however, his day-to-day work was unchanged because CTS continued to call him in
to work on a daily basis as a freelance clerk.  (English Dep., at 64-66; English Decl., at 6-7.)

In the summer of 2000, the transformation of CTS into CSA took place, with CSA commencing operations in September 2000.[25]  English's name was omitted from a July 2000 list of CTS company clerks to be hired by CSA; however, the omission was remedied in August 2000, and English's name was added to the list.  (Smith Dep., at 47; English Dep., at 67; Plaintiff's Exhs. F, G, I.)[26]  In September 2000, English began working for CSA as a company clerk in the warehouse division.  (English Decl., at 7.)[27]  However, English was no longer assigned bookman responsibilities, but instead worked deliveries of wood pulp and steel by truck.  (*Id.*)  On July 1, 2001, a published seniority list for CSA placed English tenth out of eleven employees, with only Forrest duBruyne ranking below him.  (Plaintiff's Exh. K.)

In approximately October 2001, CSA assigned English to the Clipper Line account as assistant bookman to an employee named John Hayes, who was not listed on CSA's July 2001 seniority roster at all.  (*Id.*)[28]  Because his predecessor, Pam Harper (who had worked the Clipper

---

[25]     Prior to the merger, both CTS and SSA (the other merging entity) formed transition companies and made certain non-union transition work available to their clerks. (Wilkins Decl., ¶ 5.)  Defendant's brief faults English for not "seiz[ing] the opportunity" to perform lower paying, non-union transition work under this arrangement.  (Defendant's Brief, at 4 n.3.)  In so doing, however, CSA disregards evidence that English did not perform transition work because he "was pretty much regular" with CTS at that time, such that he had no "need to go over there and work for less wages."  (English Dep., at 121.)  Defendant's apparent criticism of English for not taking on lower-paying non-union transition work when he was already fully engaged performing higher-paying union regular work is difficult to follow.

[26]     CSA Stevedoring Division Operations Manager Bobby Smith testified that English's name was initially left off the list simply because Smith did not know that English was working for CTS as a company clerk at that time.  (Smith Dep., at 36, 47.)  English has come forward with no evidence suggesting that this omission was anything other than an innocuous oversight.

[27]     Defendant's Memorandum describes these events as having occurred in mid-September 2003.  (*See* doc. 50, at 2.)  The Court assumes that this date is a typographical error, given the dearth of evidence to fix a date other than September 2000 for this event.

[28]     Hayes had worked for a subsidiary of SSA called Total Logistics Company ("TLC") during the transition period from 1998 through October 1, 2001.  TLC was the arm of SSA that performed stevedoring work.  (Smith Dep., at 72.)  When the transition period ended, Hayes was hired by CSA as a company clerk and assumed bookman/clerk-in-charge duties for the Clipper Line account.  Prior to 1998, Hayes had worked at the Port of Mobile for an

Line in the transition), failed to train English on that account's computer system, English encountered some problems with data entry on that system.  (*Id.* at 7-8.)  Aside from that issue, however, English found the Clipper Line to be no more difficult than any other line.  (*Id.* at 8.)

> **C.      The January 2002 Employment Decisions.**

CSA lost the Clipper Line account on December 31, 2001, at which time both English and Hayes returned to the warehouse.  (English Decl., at 8.)  Just four days later, on January 4, 2002, CSA announced that it would "reduce [the] number of clerks according to company seniority" because of the loss of the Clipper Line account, and that English, Forrest duBruyne, and Hayes had been selected for layoff because they were "the three lowest personnel on this list."  (English Dep., at Exh. 9; English Decl., at 8.)  Both duBruyne (age 50 at that time) and Hayes (age 41) are white, and younger than English.  The announcement stated that "this decision is based solely on economic conditions."  (English Dep., at Exh. 9.)  As a result, English continued working for CSA, albeit as a freelance clerk, a role he continued to perform for CSA through the filing of this lawsuit in 2005.  (English Decl., at 8; English Dep., at 126, 152.)

On January 7, 2002, a mere three days after laying off English, duBruyne and Hayes, CSA rehired Hayes for the position of Assistant Chief Clerk.  (English Dep., at Exh. 10.)  The Assistant Chief Clerk is responsible for assigning clerks to available work.  (English Decl., at 8.)  That position had been vacant during the first months of CSA's operations before Hayes was selected to fill it, and English was aware of no reason why CSA needed to fill the position at that time.  (*Id.*)  Moreover, CSA never apprised English of the availability of the Assistant Chief Clerk job and never invited him to apply, and it was weeks after the fact before English became aware that Hayes had been hired for that slot.  (*Id.*)[29]

---

unrelated stevedoring company called Strachn Shipping.  (English Decl., at 7.)

[29]      The Union's membership and Executive Committee never formally approved of the placement of Hayes into that position; indeed, the Union's president, Michael Bowden, acknowledged that Union members had not expressly consented to the hiring of Hayes. (Bowden Dep., at 93.)  Instead, Bowden's testimony was that he personally consented to the hiring of Hayes for the Assistant Chief Clerk job, after consultation with the Union Vice President, who was (coincidentally enough) Hayes himself.  (*Id.* at 94-96.)

CSA Stevedoring Division Operations Manager Bobby Smith testified that Hayes was tapped for the Assistant Chief Clerk position because he "was the best candidate, the best person to fill the slot, because he had booking experience, he's headed up piers in the past, he has great working knowledge of cargoes, he has good communications skills with customers and other employees, ... [and he is] single best individual on overseeing other individuals under his direction." (Smith Dep., at 159.)  Meanwhile, Smith testified, CSA did not feel that English "could do as good a job" as Hayes in these areas.  (*Id.*)[30]  Smith admitted that if CSA had done the January 2002 layoffs and rehiring as one step instead of two (*i.e.*, if one existing company clerk was "relocated," or if only two company clerks had been furloughed), that decision would have been made by virtue of company seniority.  (*Id.* at 160.)[31]  Because English had higher company seniority than both DuBruyne and Hayes, Smith acknowledged, he would have kept his job in that scenario.  (*Id.*)[32]

---

[30]     Smith conceded that he possessed only limited knowledge of English's work experience.  Indeed, Smith testified that he did not know until this litigation that English had ever performed bookman's work, and also professed ignorance of his computer skills and training.  (Smith Dep., at 38, 175.)

[31]     There is an apparent tension in Smith's testimony on this point.  On the one hand, he testified that a decision to "relocate one individual" would have been done by seniority.  On the other, he testified that Hayes could have been moved into the Assistant Chief Clerk job at any time, without regard to seniority.  (Smith Dep., at 162.)  Plaintiff cites only the first of these statements, and defendant cites only the second, with no one attempting to reconcile or explain the two.  The Court will resolve this inconsistency in plaintiff's favor for summary judgment purposes.

[32]     English cites Union president Bowden's testimony for the proposition that the meeting at which CSA selected Hayes as Assistant Chief Clerk "lasted seconds."  (Plaintiff's Brief, at 10.)  But the cited passage refers to the March 2004 hiring decision, not the January 2002 hiring.  (Bowden Dep., at 126.)  Furthermore, it is a distortion of Bowden's testimony to characterize it as stating that the entire meeting lasted seconds; on the contrary, Bowden simply said that his participation lasted seconds, as he walked in to the meeting, said who he thought the best candidates were, and walked out.  (*Id.*)  Clearly, Bowden cannot testify as to how long the other meeting participants, or CSA management generally, deliberated over the hiring decision in his absence.  The only evidence on that point is Smith's testimony that the meeting for the March 2004 hiring decision lasted 45 minutes, a far cry from mere seconds.  (Smith Dep., at 213.)

### D.      The March 2004 Hiring Decisions.

On March 10, 2004, CSA informed the Union that it intended to hire two new company clerks because of current and potential increases in CSA's business at the Port of Mobile. (English Dep., at Exh. 13.)  CSA requested that the positions be posted for 10 working days to allow Union members to apply in writing, and formally sought a list of interested candidates from the Union.  (*Id.*)

Five Union members applied for the two vacancies during the designated time period, to-wit: Anthony Costell (white, 56 years old), duBruyne (white, 52 years old), English (black, 58 years old), Paul Smith (white, 31 years old), and Gerry Givens (white, 46 years old).  (English Exh. Q; Holifield Decl., ¶ 5.)  The Union forwarded all five names to CSA, and on March 31, 2004 CSA announced its selection of duBruyne and Givens for the subject positions, effective April 5, 2004.  (English Exh. R.)  For his part, however, English did not learn that the positions had been filled by two other applicants until April 12, 2004.  (English Decl., at 9.)  English was upset with Givens' selection, given his understanding that Givens "had very little waterfront seniority and no company seniority," and that "[e]xcept for a limited period in 2000-01 he had worked sparingly on the docks."  (*Id.*)[33]  In discovery responses, CSA stated that Givens was hired, despite having less seniority than English, because "he had superior ability and qualifications to perform traditional 'bookman' or 'clerk-in-charge' duties."  (CSA Interrog. Resp., #14.)  CSA also stated in discovery that it "did evaluate the skills and qualifications of the three senior clerks on the promotion list, including Givens and English," and concluded based on that evaluation that Givens' qualifications were superior.  (CSA Resp. to Req. for Admissions, at #13.)  The decisionmaker, Operations Manager Smith, explained that he "thought Gerry Givens was more self-motivated than Rufus English, dealt with customers problem solving and knew the industry better.  And not to say anything negative about Rufus, but that Gerry Givens was better

---

[33]      Givens confirmed English's assessment of his seniority by testifying, "I'm so low on the seniority list.  I'm the bottom man in the union."  (Givens Dep., at 18.)  Givens also testified that from October 2003 through March 2004, he had been working for CSA as a freelance clerk, but had received less than one call per month, totaling just four calls (two of which he had missed because of pager problems) to come in and work.  (*Id.* at 26-27.)

qualified." (Smith Dep., at 219.)[34]  When pressed about how Givens was more self-motivated or had more industry knowledge or worked better with customers than English, Smith was unable to provide specifics; however, Smith emphasized that he placed heavy weight on the recommendations of CSA managers who had direct dealings with both men.  (*Id.* at 221-23.)[35]

In addition to contesting Givens' relative qualifications, English asserts that CSA's failure to hire him in March 2004 violated the "well known custom in the industry that it [*sic*] you worked for one company, as company clerk, and there was a lay off due to loss of business, you would be called back in the order of your company seniority.  The company would call back employees rather than hire new employees off the board."  (English Decl., at 7.)  Plaintiff also points to a July 13, 2000 letter in which CSA agreed "to work under port 'past practices and customs' ***recognized by employers and both locals***."  (Plaintiff's Exh. F, at 2 (emphasis added).)  However, plaintiff offers no evidence that this rehire custom might qualify as a "past practice or custom" recognized as such by stevedoring companies and relevant union locals.

English filed a grievance with the Union to contest the hiring of Givens for the company

---

[34]     The record is clear that Smith had only "limited knowledge of [English]'s capabilities" at the time of these hiring decisions.  (Smith Dep., at 196.)  Although Smith testified that he did not know whether English could perform booking duties for Star Shipping or Zim Line, he also acknowledged that none of the applicants had ever booked those lines.  (*Id.* at 195, 197.)  According to Smith, during the decisionmaking process Hayes "made the simple statement he thought either one of them could do the job," but CSA managers Tony Rogers, Terry Roberts and Kenneth Hirsch all felt that Givens was the most qualified.  (*Id.* at 214.)  Of those managers, Hirsch was most emphatic that Givens was the superior candidate, citing favorable observations of Givens' work but not offering a negative assessment of English.  (*Id.* at 215-16.)  Smith based his decision primarily on the recommendations and observations of Rogers, Roberts and Hirsch.  (*Id.* at 218.)  English points out, however, that Smith, Roberts and Hirsch worked in a building almost a mile from the docks, and that he never saw them come to the docks to observe his performance.  (English Decl., at 10.)

[35]     In his brief, plaintiff cites to discovery responses completed by the Union which allegedly offer a different slant on the decision to hire Givens.  (Plaintiff's Brief, at 17.)  In particular, plaintiff contends that the Union stated in discovery responses that Smith informed Union president Mike Bowden that he (Smith) admired Givens for having accepted lower-paying transition work under the TLC agreement, and that Smith had decided back in 2000 to hire Givens if ever given the chance.  (*Id.*)  Unfortunately, this discovery response is not included in the summary judgment record; therefore, it is not properly before the Court and cannot be considered in resolving CSA's Motion for Summary Judgment.

clerk position.  (English Decl., at 10.)  On the same day, English attended a grievance hearing at which, he testified, Bobby Smith "said that CSA was looking at younger employees and he didn't hire Paul Smith because he was too young or something like that, he said.  I'm not sure of the facts."  (English Dep., at 207.)  Upon further questioning, English confirmed that Smith had "[m]ade the statement that CSA was looking for younger employees" during the May 2004 grievance hearing.  (*Id.* at 208.)[36]  The grievance was ultimately denied.

On October 7, 2004, English filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") in which he declared under penalty of perjury that he had applied for a regular clerk position, only to learn on April 12, 2004 that he had not been selected.  Based on these facts, English alleged that CSA had discriminated against him on the basis of his race (black) and his age (58), in violation of Title VII and the ADEA.  (English Dep., at Exh. 19.)[37]  On March 2, 2005, the EEOC provided English with a Dismissal and Notice of Suit Rights, and this Complaint ensued on May 27, 2005.

During the pendency of this litigation, CSA has elevated English to the position of company clerk.  The uncontroverted evidence is that defendant hired plaintiff as a company clerk effective May 29, 2006.  (Smith Supp. Decl., ¶ 3.)  Thus, it appears that English has recently been selected for, and is currently performing, the very job that he claims to have been wrongfully denied for discriminatory reasons in 2004.[38]

_____

[36]     Defendant counters English's testimony in this regard by submitting declarations from five witnesses denying that Smith made any such statements during the meeting.  (*See* CSA Brief, at 16-17.)  For summary judgment purposes, of course, the forceful denials and emphatic protestations set forth in defendant's proffered evidence are unhelpful because the record is viewed in the light most favorable to the plaintiff.

[37]     The record is devoid of any indication that English ever filed EEOC Charges pertaining to his 2002 layoff or his 2002 non-selection for the Assistant Chief Clerk post that CSA awarded to Hayes.  Rather, the October 2004 EEOC Charge appears to be English's first and only Charge relating to the issues raised in this litigation.  (*See* Smith Supp. Decl., ¶ 1.)

[38]     Given that the 2004 hiring decision is the moving force behind this Complaint, English's subsequent hiring by CSA for that post may have profound implications for the scope and level of damages that English might recover and may affect a jury's perception as to whether he has been wronged.  Notwithstanding this potentially seismic development, all indications are that the parties wish to move forward with this lawsuit; therefore, the Court will consider the

IV.     **Summary Judgment Standard.**

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11ᵗʰ Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11ᵗʰ Cir. 1992) (internal citations and quotations omitted).   However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment.  *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11ᵗʰ Cir. 2004).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11ᵗʰ Cir. 2004).  Rather, "the summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale."  *Id.* at 1086 (citation omitted).

V.      **Legal Analysis.**

In a nutshell, defendant's position on summary judgment is that plaintiff's Title VII and ADEA claims are barred for failure to exhaust administrative remedies in a timely fashion, that his § 1981 race discrimination claims fail for lack of evidence of pretext, and that his state law

---

Rule 56 motion, and leave the ramifications of the CSA's May 2006 hiring decision for another day.

claim of outrage is legally insufficient as a matter of law.

**A.    *Limitations Issues.***

A plaintiff may not sue under Title VII or the ADEA unless he first exhausts administrative remedies by filing a timely charge of discrimination with the EEOC.  *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11ᵗʰ Cir. 2001) (Title VII); *Jones v. Dillard's, Inc.*, 331 F.3d 1259, 1263 (11ᵗʰ Cir. 2003) (ADEA).  In a non-deferral state such as Alabama, the deadline for filing is 180 days after the alleged discriminatory act.  *See Ledbetter v. Goodyear Tire and Rubber Co.*, 421 F.3d 1169, 1178 (11ᵗʰ Cir. 2005) (explaining that Alabama is a non-deferral state, such that only unlawful practices occurring within 180 days of the operative EEOC charge can yield Title VII liability); *Jones*, 331 F.3d at 1263 (finding that in states without state equivalent to EEOC, such as Alabama, ADEA requires charge to be filed within 180 days).  Defendant maintains that English has failed to satisfy this threshold 180-day filing requirement with respect to either his 2002 claims or his 2004 claims.

1.    *Title VII and ADEA Claims Regarding 2002 Personnel Decisions.*[39]

As discussed *supra*, the parties are in agreement that English is pursuing race and age

---

[39]    Defendant concedes that English's § 1981 claims of race discrimination arising from the 2002 employment decisions "are timely because § 1981 has a four-year statue of limitations under 28 U.S.C. § 1658."  (Defendant's Brief, at 29 n.15.)  The Court is not at all convinced of the accuracy of this statement; indeed, a compelling argument might be made that plaintiff's § 1981 claims arising from the decision not to hire him as Assistant Chief Clerk in January 2002 are subject to a two-year limitations period.  *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 124 S.Ct. 1836, 1845, 158 L.Ed.2d 645 (2004) (holding that § 1981 cause of action is governed by the 4-year "catch-all" limitations period established by § 1658 only "if the plaintiff's claim against the defendant was made possible by a post-1990 enactment" to § 1981); *Cooper v. Southern Co.*, 390 F.3d 695, 727 n.19 (11ᵗʰ Cir. 2004) (explaining *Jones* as holding that claims made possible by amendment to § 1981 in Civil Rights Act of 1991 are governed by 4-year limitations period, while claims possible prior to that amendment remain subject to 2-year limitations period); *Patterson v. McLean Credit Union*, 491 U.S. 164, 182, 185, 109 S.Ct. 2363 (1989) (showing that under pre-1991 version of § 1981, claims of race-based failure to hire were actionable, and claims of race-based failure to promote were actionable if "the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer").  However, the Court will not articulate movant's arguments for it, nor will it look behind movant's express concessions.  The Court therefore assumes, without deciding, that plaintiff's § 1981 claims arising from the 2002 events were subject to a four-year limitations period and are not time-barred.

Case 1:05-cv-00312-WS-B   Document 63   Filed 08/22/06   Page 23 of 42

discrimination claims under Title VII, the ADEA, and § 1981 arising from his layoff in January 2002 and CSA's subsequent decision not to hire English for the Assistant Chief Clerk position, also in January 2002. It is uncontroverted, however, that plaintiff <u>never</u> filed an EEOC Charge of Discrimination pertaining to the alleged incidents of race and age discrimination in 2002. Accordingly, plaintiff's Title VII and ADEA claims relating to the 2002 personnel decisions are properly **dismissed** for failure to exhaust administrative remedies in a timely manner. *See, e.g., Wilkerson*, 270 F.3d at 1317 ("Before a potential plaintiff may sue for discrimination under Title VII, she must first exhaust her administrative remedies.").[40]

2. *Title VII and ADEA Claims Regarding 2004 Hiring Decision.*

With regard to the 2004 company clerk positions, the timeliness issue is a bit different. It is undisputed that plaintiff did in fact file an EEOC Charge on October 7, 2004 relating to CSA's failure to hire him as a company clerk. Defendant's position is that the Charge was filed more than 180 days after English was notified of his non-selection, rendering it untimely and barring plaintiff's Title VII and ADEA claims relating to that event. (Defendant's Brief, at 29.)[41] Certainly, there is evidence in the record that might support an inference that English learned that he had been passed over for the company clerk job on April 9, 2004, or 181 days before he filed his EEOC Charge. However, there is also credible evidence that English first received this information on April 12, 2004, or 178 days before he filed the Charge. (*See* English Decl., at 9;

---

[40] Plaintiff did not even respond to CSA's limitations/exhaustion argument as it pertains to the 2002 events. Given such an obviously fatal procedural defect in those claims, it is unclear why plaintiff brought such claims in the first place, and why he failed to withdraw them upon discerning their insurmountable shortcomings in the limitations/exhaustion realm.

[41] The summary judgment briefs submitted by both parties utilize footnotes whose microscopic font size is substantially smaller than that of the text in the body of their briefs. In so doing, the parties run afoul of Local Rule 5.1(a)(2), which provides that font sizes must not be smaller than 12 point type. No special exceptions are provided for footnotes. Additionally, plaintiff's brief employs top and bottom margins that appear substantially smaller than the one inch mandated by Local Rule 5.1(a)(1). Both tactics appear designed to shoehorn excessively lengthy briefs into the existing page limitations for this District Court. Such techniques may result in future filings being stricken. When counsel finds it impossible to comply with Local Rule 7.1(b)'s published page limitations, the appropriate remedy is to seek leave and show cause to exceed those limits, not to tinker with the formatting of the existing submission.

-23-

EEOC Charge, at 1.)  The Court cannot definitively resolve this factual discrepancy at the Rule 56 stage.  The record in the light most favorable to plaintiff supports a reasonable inference that English first became aware that he had not been hired as a company clerk on April 12, 2004, such that he filed his EEOC Charge within 180 days after acquiring that knowledge. Accordingly, the Motion for Summary Judgment is **denied** to the extent that it seeks to jettison plaintiff's Title VII and ADEA claims pertaining to the March 2004 hiring decision on limitations or exhaustion grounds.

> ### B.    The **McDonnell Douglas** *Burden-Shifting Framework.*

Absent direct evidence of discrimination,[42] English must make a showing of circumstantial evidence which satisfies the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under this familiar, tripartite burden-shifting analysis, plaintiff is required to make out a *prima facie* case of race and age

---

[42]    Both parties' briefs rely exclusively on a *McDonnell Douglas* inferential analysis, without performing a "direct evidence" analysis.  Plaintiff's decision not to argue direct evidence is perhaps debatable.  Given the record evidence that the CSA decision maker stated at a grievance hearing following the 2004 hiring decision that "CSA was looking at younger employees," plaintiff might have formulated a colorable argument that this statement was direct evidence of age discrimination.  *See, e.g., Wilson*, 376 F.3d at 1086 (observing that direct evidence of discrimination is "evidence that, if believed, proves the existence of a fact without inference or presumption," but is confined to "only the most blatant remarks"); *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) (explaining that direct evidence of discrimination shifts burden of persuasion to employer); *Taylor v. Runyon*, 175 F.3d 861, 867 n.2 (11th Cir. 1999) (pointing out that if trier of fact accepts direct evidence that defendant acted with discriminatory motive, then ultimate issue of discrimination is proved).  But plaintiff has eschewed any direct evidence argument here.  The Court will not unilaterally formulate, present, and evaluate any such arguments that plaintiff could have made, but has elected not to make. *See Pinto v. Universidad De Puerto Rico*, 895 F.2d 18, 19 (1st Cir. 1990) ("the court is under no duty to exercise imagination and conjure what a plaintiff might have alleged, but did not, and do counsel's work for him or her"); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment"); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp.2d 1228, 1236 (M.D. Ala. 2000) ("[i]t is not for the court to manufacture arguments on Plaintiff's behalf" in response to a summary judgment motion).  For these reasons, the Court will rely exclusively on the inferential mode of analysis, just as the parties have done in their briefs.

discrimination.[43]  If he does so, that showing "creates a rebuttable presumption that the employer acted illegally."  *Underwood v. Perry County Com'n*, 431 F.3d 788, 794 (11th Cir. 2005).  At that point, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for [the adverse employment action]. ... If the employer does so, the burden shifts back to the plaintiff to introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination."  *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997) (citations omitted).  A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted); *see also Wilson*, 376 F.3d at 1088 (similar).  The ultimate burden of persuasion remains with the plaintiff.  *See E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002).  Thus, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (*en banc*).[44]

Here, English complains of race and age discrimination by CSA in hiring and layoff decisions.  To establish a *prima facie* case of discriminatory denial of promotion or failure to hire under federal anti-discrimination statutes, a plaintiff must show that (i) he belongs to a racial

---

[43]     English's burden of establishing a *prima facie* case is not heavy.  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) ("the *prima facie* requirement is not an onerous one"); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998) (plaintiff's "burden in proving a *prima facie* case is light").

[44]     Plaintiff's brief bemoans the imprecision of the pretext requirement, arguing that extant case law (despite its vast bulk, numerosity and volume) lends insufficient guidance to litigants and district courts in delineating exactly what is sufficient to discharge a plaintiff's "pretext" burden.  (Plaintiff's Brief, at 29-30.)  Whatever merit this withering theoretical critique of the time-honored *McDonnell Douglas* test might have, it is not this Court's place to reformulate a legal standard that has been the cornerstone of Title VII jurisprudence in this country for more than 30 years.  Instead, this Court is constrained to apply the decisions handed down by the Supreme Court and Eleventh Circuit, which unequivocally prescribe the *McDonnell Douglas* pretext framework in these circumstances.

minority (or is in the protected age class); (ii) he was qualified for and applied for a position the employer was trying to fill; (iii) he was denied the position; and (iv) others who were not members of the protected class (or who were substantially younger than plaintiff) were hired, or the employer continued to seek applicants with the plaintiff's qualifications.  *See Vessels v. Atlanta Independent School System*, 408 F.3d 763, 768 (11th Cir. 2005); *Underwood*, 431 F.3d at 794; *Wilson,* 376 F.3d at 1089.  "A plaintiff does not shift the burden to the defendant under *McDonnell Douglas* merely by stating that he was fired or treated unfavorably.  *McDonnell Douglas* requires the plaintiff to establish a *prima facie* case which includes identifying an individual who replaced him or was treated better than he was who was not a member of his protected class."  *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005); *see also Underwood*, 431 F.3d at 794 (finding that Title VII plaintiff in failure-to-hire context must show that successful applicant was not within his protected class).  "Only after the plaintiff has made his *prima facie* case does the burden shift to the defendant."  *Morris*, 402 F.3d at 1082.[45]

### C.     The 2002 Layoff Decision.

English's first discrimination claim is a § 1981 cause of action alleging that CSA laid him off in January 2002 because of his race.  CSA contends that plaintiff cannot establish a *prima facie* case of discrimination on this claim and that, even if he could, CSA has articulated a

---

[45]      Certain of plaintiff's discrimination claims sound in § 1981; however, the substantive analysis for those claims is no different than it is for the Title VII and ADEA claims.  Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts, and has been routinely extended to the employment context.  *See Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1270 (11th Cir. 2004).  Although § 1981 claims do not share the exhaustion requirement of their Title VII counterparts, their elements are identical in a disparate treatment case.  The Eleventh Circuit has noted, "[b]oth of these statutes have the same requirements of proof and use the same analytical framework."  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also Cooper*, 390 F.3d at 724 n.16 ("The *McDonnell Douglas* framework for establishing a *prima facie* case is used in intentional discrimination cases brought under either Title VII or Section 1981."); *Howard v. BP Oil Co.*, 32 F.3d 520, 524 n.2 (11th Cir. 1994) (explaining that the Title VII burden-shifting framework for analyzing claims of discriminatory treatment also applies to § 1981 claims); *Sanders v. City of Montgomery*, 319 F. Supp.2d 1296, 1311 (M.D. Ala. 2004) ("The legal analysis of claims of race discrimination pursuant to either Section 1981 and Title VII is the same.").  This Court therefore relies on the traditional Title VII framework to analyze plaintiff's § 1981 claims, just as it does in examining plaintiff's Title VII and ADEA theories of recovery.

legitimate nondiscriminatory reason which plaintiff cannot show to be pretextual.

In the layoff context, the Eleventh Circuit has imposed an additional element, above and beyond the standard requirements (all of which are clearly satisfied here) of showing protected class, qualifications, and occurrence of an adverse employment action. To show a *prima facie* case of race discrimination in a reduction in force setting, a plaintiff must also "produce some evidence that an employer has not treated [race] neutrally, but has instead discriminated based upon it. Specifically, the evidence must lead the factfinder reasonably to conclude either that the defendant (1) consciously refused to consider retaining or relocating a plaintiff because of his [race], or (2) regarded [race] as a negative factor in such consideration." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 798 (11th Cir. 2005) (citation omitted); *see also Jameson v. Arrow Co.*, 75 F.3d 1528, 1532 (11th Cir. 1996) (similar). It is this last factor to which defendant's summary judgment argument is directed in the first instance.

To shoulder his burden on this point, English proffers two arguments. First, he acknowledges that *Rowell* "is a correct statement of current Eleventh Circuit jurisprudence," but urges this Court to "jettison" its formulation of the *prima facie* case as inconsistent with other authorities. (Plaintiff's Brief, at 22.) This the Court cannot and will not do.[46] Second, plaintiff likens this case to *Jameson*, in which the Eleventh Circuit held that an inference of discrimination was permissible and the *prima facie* elements were satisfied where the employer failed to hire the plaintiff into available vacancies during a reduction in force, but instead hired persons outside the protected class to fill those slots. 75 F.3d at 1532-33.[47] The analogy is apt, as English's evidence is that CSA engaged in the same kind of process (*i.e.,* laying off a protected class worker and simultaneously hiring a comparable non-protected class worker into another position) that was found to satisfy the *prima facie* test in *Jameson*. As such, plaintiff has satisfied his *prima facie* obligations with respect to the 2002 layoff, and the burden of production

---

[46]    *See, e.g., McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004) (observing that "[a] circuit court's decision binds the district courts sitting within its jurisdiction"); *Arriaga v. Florida Pacific Farms, L.L.C.*, 305 F.3d 1228, 1240 n.15 (11th Cir. 2002) ("decisions of the Supreme Court and this court are binding on the district courts of this circuit").

[47]    Defendant's reply brief proffers no rebuttal to plaintiff's reliance on *Jameson* to demonstrate his ability to establish a *prima facie* case of race discrimination as to this claim.

therefore shifts to CSA to come forward with a legitimate nondiscriminatory reason for its decision to lay off English.

Defendant responds that English was laid off because of the loss of Clipper Lines, a significant account on which English was working full-time in the fourth quarter of 2001, as a customer to a non-union stevedore effective January 1, 2002. (Hirsch Decl., ¶ 14.)  When the Clipper Lines business was lost, the overall level of CSA's work declined, prompting CSA to release three company clerks. (*Id.*, ¶¶ 15-16.)  Having chosen to conduct a small reduction in force, CSA turned to its Working Agreement with the Union for the proper procedures shaping execution of that decision. (*Id.*, ¶ 15.)  Under that Agreement, "[c]ompany seniority shall determine the order of layoff of regular clerks under the principal [*sic*] of 'last in, first out.'" (English Dep., at Exh. 2, ¶ 7(e)(2).)  To satisfy its contractual obligations to the Union, then, defendant was bound to carry out the layoff by terminating the three company clerks with the least company seniority. (Hirsch Decl., ¶ 15.)  In order of seniority (from most to least senior), CSA employees English, Forrest duBruyne and John Hayes were the three least senior company clerks at that time, so they were designated for layoff. (*Id.*)  This showing plainly satisfies defendant's burden of production.

Defendant having met its burden, "the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination." *Vessels*, 408 F.3d at 771. "This evidence must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Id.* (citations omitted). Plaintiff's pretext argument is not delineated with as much clarity as one might hope; however, he apparently challenges the need to conduct a layoff at all in January 2002 (Plaintiff's Brief, at 9), and further argues that the parties' history (*e.g.*, initially leaving English's name off the July 2000 hire list, not assigning English bookman duties that he had performed previously, not giving English adequate training on the Clipper Lines computer system, not hiring a black

employee named Carlis Howze in 2000)[48] establishes that the January 2002 layoff was part of a lengthy sequence of discriminatory actions directed at English.  (*Id.* at 28-29.)

CSA's decision to lay off three company clerks in January 2002 was a business decision following close on the heels of the loss of an account.  As a general proposition, a plaintiff cannot establish pretext simply by disputing the wisdom of that business decision.  *See Rowell*, 433 F.3d at 798-99 (explaining that "[i]t is by now axiomatic that we cannot second-guess the business decisions of an employer"); *Chapman*, 229 F.3d at 1030 (in showing pretext, "employee cannot succeed by simply quarreling with the wisdom of that reason").  The uncontroverted evidence is that CSA lost an account, that it immediately decided to trim its ranks of company clerks by three, and that it executed that decision in strict compliance with the applicable collective bargaining agreement.  Any contention by plaintiff that no layoff was necessary, that fewer than three company clerks should have been released, or that the layoff should have been conducted in a manner other than that prescribed by the collective bargaining agreement is just the sort of armchair-quarterbacking which the Eleventh Circuit has steadfastly refused to indulge in the context of the pretext analysis.[49]  Likewise, plaintiff's argument that at

---

[48]        Smith testified that CSA had concluded that, even though Howze had more company seniority for the position in 2000, CSA had elected to hire another applicant whom it deemed the "best qualified person for the job."  (Smith Dep., at 90-91.)  English has proffered no evidence tending to undermine CSA's explanation or to show that defendant was motivated by race discrimination in not hiring Howze in 2000.

[49]        The gravamen of plaintiff's pretext argument appears to be that the layoff was a ruse because it was performed in conjunction with the immediate rehire of one of the laid-off white employees (Hayes) as Assistant Chief Clerk.  By simply shuffling Hayes from one job to another, plaintiff argues, CSA exposed this RIF as really a layoff of two people, not three.  Had the two-person layoff been performed without the subterfuge of layoff-and-rehire, plaintiff maintains, English would have kept his job because he was higher on the seniority list than both Hayes and duBruyne.  (Plaintiff's Brief, at 9, 28-29.)  Had Hayes been immediately rehired into the same job (company clerk), this contention might hold allure.  But Hayes was rehired into a different job, Assistant Chief Clerk, whose duties were different than those of a company clerk because they involved "primary responsibility for the hiring and placement of clerks in warehouse operations."  (*See* Hirsch Decl., ¶ 16; Hayes Decl., ¶ 5; Roberts Decl., ¶ 5.)  CSA decided to fill the Assistant Chief Clerk position in January 2002, after three months of operations and despite its business downturn, because it determined that doing so "made operational sense in the long run."  (Hirsch Decl., ¶ 16.)  Contrary to English's contention, the

other times in other places CSA has treated black employees less favorably is unpersuasive because it rests on perceived slights that were promptly corrected (*e.g.*, the exclusion of English from the July 2000 hire list), business decisions pertaining to assignment and allocation of labor (*e.g.*, the relative non-use of English as a bookman), or employment decisions pertaining to other workers whose circumstances are attenuated from those at issue here.

"[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Clark v. Coats & Clark, Inc*., 990 F.2d 1217, 1228 (11th Cir.1993) (citation omitted).  Considering plaintiff's pretext evidence and arguments in their entirety, the undersigned is of the opinion that English has failed to meet this burden as to the January 2002 reduction in force.  Accordingly, defendant's Motion for Summary Judgment is **granted** as to the § 1981 claim arising from the 2002 layoff.

  **D.**  ***The 2002 Assistant Chief Clerk Hiring Decision.***

Plaintiff's next claim is a § 1981 race discrimination cause of action arising from CSA's decision to hire Hayes, and not English, for the Assistant Chief Clerk position.  Defendant correctly concedes that plaintiff has produced sufficient evidence to establish a *prima facie* case (Defendant's Brief, at 22);[50] therefore, the Court will move straight to the second and third steps of the *McDonnell Douglas* analysis.

---

ranks of CSA's company clerks fell by three, not two, in January 2002.  As such, there is no evidence to support plaintiff's insistence that CSA "only laid off two" company clerks in January 2002.  (Plaintiff's Brief, at 28.)  Far from being a bait-and-switch, the only evidence before the Court is that the January 2002 layoff was a bona fide effort to reduce the number of company clerks on CSA's payroll following a decline in business, while the hiring of an Assistant Chief Clerk was a separate decision designed to promote CSA's long-range objectives.

  [50]  After admitting that English has satisfied his *prima facie* burden, CSA drops a footnote to argue that plaintiff has not done so because he did not satisfy CSA's qualifications for the job.  (*See* Defendant's Brief, at 23 n.12.)  For starters, this argument clashes with defendant's stated position in the body of the brief.  Furthermore, the Court is aware of no evidence – and defendant cites to none – that CSA deemed English unqualified for the Assistant Chief Clerk job.  At most, the evidence is that CSA found English not to be the most qualified candidate, not that he was unqualified in some absolute sense.  Such backtracking on a minor point, where the record does not support doing so, serves only to muddy the waters.

Defendant explains its decision not to hire English as Assistant Chief Clerk in the following terms: The Working Agreement between CSA and the Union authorized CSA to select an Assistant Chief Clerk "with the consent of the Union without regard to seniority." (English Dep., at Exh. 2, ¶ 7(a).)  Being at liberty to select anyone they wished, so long as the Union consented, and not being bound by seniority, CSA managers decided to hire Hayes, based on their assessment that "he had booking experience, he's headed up piers in the past, he has great working knowledge of cargoes, he has good communications skills with customers and other employees," and he is the "single best individual on overseeing other individuals under his direction." (Smith Dep., at 159.)[51]  After consultation among those managers, CSA elected not to hire English for this job because its assessment was that he did not rank as highly on those indices as did Hayes.  (*Id.*)[52]  This evidence certainly establishes a legitimate nondiscriminatory reason for the personnel decision at issue.

Again, plaintiff's pretext argument is largely camouflaged within his brief; however, the Court understands his position to be that CSA's qualifications-based explanation for hiring Hayes is pretextual because (a) English had far more company seniority than Hayes; and (b)

---

[51]     This explanation was echoed by other CSA officials.  Chief Clerk Terry Roberts recommended Hayes for the job because he was "the most versatile and skilled bookman / clerk-in-charge of all those on the seniority list." (Roberts Decl., ¶ 5.)  Roberts deemed Hayes "the best bookman/clerk-in-charge for CSA" by virtue of his "superior skills and initiative" and his "exceptional" organizational and leadership skills.  (*Id.*, ¶ 2.)  Tony Rogers, who was CSA's General Stevedoring Superintendent at that time, similarly recommended Hayes because Rogers "believed his skills as a bookman/clerk-in-charge, work ethic and initiative surpassed all other available clerks."  (Rogers Decl., ¶ 3.)  CSA's Warehouse Operations Manager, Kenny Hirsch, was personally familiar with Hayes' work on the Clipper Lines account in the fall of 2001 as well as his work for TLC previously, and found that Hayes "had demonstrated exceptional skill as a bookman/clerk-in-charge," had "demonstrated his ability to communicate with shippers, shipping agents and suppliers" and "had demonstrated superior ability to direct the work of other clerks."  (Hirsch Decl., ¶ 17.)

[52]     In that regard, Hirsch averred that he had observed English's work on the Clipper Lines account in fall 2001.  (Hirsch Decl., ¶ 13.)  In the course of those observations, Hirsch found that English "was unable to perform satisfactorily the work" assigned to him, that he performed "very little" bookman/clerk-in-charge work, and that English did not appear to have "near the skill, capabilities and initiative as a bookman/clerk-in-charge that John Hayes possessed."  (*Id.*, ¶¶ 13, 14, 18.)

CSA decision makers had only limited familiarity with English's job performance.[53]  The former point is irrelevant, because the uncontroverted evidence is that CSA did not (and was not required to) base its hiring decision on company seniority.  It being undisputed that seniority was not a selection criterion, the relative standing of English and Hayes on that factor is of no consequence.  *See Cofield v. Gold Kist, Inc.*, 267 F.3d 1264, 1269 (11th Cir. 2001) (declining to second-guess employer's decision to rely on qualifications rather than length of service in making personnel decision, inasmuch as courts do not sit as super-personnel departments to re-examine business decisions).

     As for the latter point, the record viewed in the light most favorable to the plaintiff is that CSA management observed both Hayes and English in the performance of their duties for CSA in the fall of 2001.  (*See, e.g.,* Hirsch Decl., ¶¶ 14, 17, 18.)[54]  Plaintiff may feel that he was more

---

[53]     Plaintiff also asserts that the Union never properly consented to Hayes' hire.  There is record evidence to support that statement.  However, such an irregularity reflects poorly on the Union (which unquestionably received notice from CSA of Hayes' proposed selection), and does not evince wrongdoing by CSA, which did everything it was required to do under the Working Agreement by submitting Hayes' name to the Union for consent purposes.

[54]     The Court understands that English has stated that Hirsch, Roberts and Smith could not have observed his job performance because their offices were located a mile from the docks and they never came down to the docks, to his knowledge.  (English Decl., at 10.)  English's suggestion that he worked for CSA without any of its managers knowing what he was doing or how well he was doing it is implausible to the extreme.  More fundamentally, it is not supported by the facts.  Hirsch's assessment of English's job performance is based specifically on his personal observations.  (Hirsch Decl., ¶ 18.)  This statement may readily be reconciled with English's averment that he was unaware of CSA managers ever observing him on the docks.  After all, it is eminently logical that Hirsch could have observed English's work without the latter's knowledge.  There is no evidence that Hirsch was obliged to notify English before observing his work, or that English was aware of every single person who came down to the docks while he was on duty.  Besides, Hirsch's assessment of English's performance was not confined to his dockwork in fall 2001, but also included his performance in warehouse operations for CSA beginning in late July 2000.  (Hirsch Decl., ¶ 18.)  Surely Hirsch, as CSA's Warehouse Operations Manager in 2000, had occasion to observe the performance of workers in CSA's warehouse operations in the summer of 2000.  Likewise, the Court credits the averment of Terry Roberts, CSA's Chief Clerk, that Roberts had occasion to personally observe English's performance as a clerk for CSA (when he was effectively under Roberts' supervision) in 2000 and 2001.  (Roberts Decl., ¶¶ 3-4.)  Thus, under any rational reading of the record, CSA managers had observed English's job performance to some degree as of January 2002.

qualified than Hayes.  He may think that the hiring decision should have been founded on seniority, rather than subjective factors.  He may believe that it was unfair for the company not to hire him when it had engaged in only limited appraisal of his abilities.  He may believe that the company's glowing assessment of Hayes' qualifications is just plain wrong.  But such subjective beliefs do not satisfy a plaintiff's burden of establishing pretext.  A plaintiff "cannot prove pretext by asserting baldly that she was better qualified than the person who received the position at issue."  *Wilson*, 376 F.3d at 1090; *see also Brooks*, 446 F.3d at 1163 (similar). Instead, for a plaintiff to satisfy pretext based on relative qualifications, the "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  *Ash v. Tyson Foods, Inc.*, --- U.S. ----, 126 S.Ct. 1195, 1197, 163 L.Ed.2d 1053 (2006);[55] *see also Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004) (same).  English clearly has not satisfied that threshold.  Nor does it suffice to demonstrate pretext for English to argue that CSA's decision was unwise or unfair because CSA should have conducted further evaluation of his job performance first.  *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) ("a plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason," as long as "the reason is one that might motivate a reasonable employer"); *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging

---

[55]     The *Ash* decision discredited the "jump off the page and slap you in the face" standard for showing pretext based on differences in qualifications, which the Eleventh Circuit had long embraced.  *See, e.g., Wilson*, 376 F.3d at 1090 (to show pretext, plaintiff must "adduce evidence that the disparity in qualifications was so apparent as virtually to jump off the page and slap you in the face") (citation omitted).  The *Ash* Court denounced this standard in acidic terms, opining that "[t]he visual image of words jumping off the page to slap you (presumably a court) in the face is unhelpful and imprecise as an elaboration of the standard for inferring pretext from superior qualifications."  *Ash*, 126 S.Ct. at 1197.  Not surprisingly, on remand, the Eleventh Circuit implicitly disavowed the "jump off the page" test in favor of the formulation recounted by the Supreme Court, and by more recent Eleventh Circuit decisions, both published and unpublished.  *See Ash v. Tyson Foods, Inc.*, 2006 WL 2219749, *3 (11th Cir. Aug. 2, 2006).

whether employment decisions are prudent or fair.").[56]

"The heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998). After careful review of plaintiff's evidence and arguments, the Court finds that no reasonable factfinder could conclude that CSA's stated reasons for selecting Hayes as Assistant Chief Clerk were not the true reasons and that race discrimination was the real reason. The uncontroverted evidence is that CSA managers unanimously evaluated Hayes as an outstanding performer in the various competencies valued in an Assistant Chief Clerk, and that based on limited observations those same managers did not rank English as highly. On this record, a reasonable fact finder could not find that CSA's qualifications assessments were not made honestly and in good faith or that CSA's stated reasons are otherwise unworthy of credence. Because English is unable to satisfy the third prong of the *McDonnell Douglas* test, his § 1981 claim arising from the January 2002 decision not to hire him as Assistant Chief Clerk is due to be, and the same hereby is, **dismissed**.

### E.     The 2004 Company Clerk Hiring Decision.

Plaintiff's final federal claim alleges race and age discrimination pursuant to Title VII, § 1981, and ADEA with respect to defendant's decision not to hire him for a company clerk position in March 2004.[57] Once again, defendant properly acknowledges that plaintiff has

---

[56]     English also appears to be resting his pretext argument on myriad facts relating to the history of CSA and the employment history of English, such as: (a) the dearth of black company clerks at CSA; (b) the allegedly wrongful hiring decision as to Howze in 2000; (c) the omission of English's name from the July 2000 hire list; (d) CSA's failure to assign English to bookman work on a frequent basis; and (e) the lack of training English received on the Clipper Lines account. The Court has afforded appropriate weight and consideration to each of these factors, as well as those discussed *supra*, in assessing plaintiff's showing of pretext.

[57]     To be clear, CSA filled two company clerk vacancies in March 2004. The first was for a "checker" job, and was filled by Forrest duBruyne (a white employee who is younger than plaintiff), the most senior eligible applicant. Plaintiff does not claim that he should have been hired for this job, or that his non-selection was the product of unlawful discrimination. The second company clerk vacancy was for a "bookman" job, and was filled by Gerry Givens. It is that second hiring decision which is in dispute here.

established a *prima facie* case of discrimination as to this cause of action. (Defendant's Brief, at 27.)[58]  There being no dispute as to whether a *prima facie* showing has been made, this analysis focuses on defendant's stated reason for the decision, and plaintiff's ability to demonstrate that such reason was a pretext for unlawful discrimination.

According to defendant, the selection process for the 2004 company clerk hiring was governed by the collective bargaining agreement between CSA and the Union. The operative Working Agreement delineates the following three-step process for selection of new company clerks: (a) CSA informs the Union of its need and requests applications from persons on the seniority list; (b) applicants may be eliminated for just cause; and (c) CSA "may select any one of the three (3) remaining senior-most applicants." (English Dep., at Exh. 3, ¶ 7(e)(4).) The three senior-most applicants for the company clerk job who were not disqualified for just cause were, in order of decreasing company seniority, English (black, 59 years old), Paul Smith (white, 31 years old), and Gerry Givens (white, 46 years old). Although Givens had the least seniority of these candidates, CSA management determined that he was the most qualified person for the job. At a 45-minute meeting, Hirsch, Rogers and Roberts all recommended to Smith that Givens be selected over English. (Smith Dep., at 214-16.)[59]  None of these managers criticized English's job performance or qualifications; however, the prevailing sentiment was that Givens was more self-motivated than English, was more proficient at dealing with customers and problem-solving, and had better knowledge of the industry. (*Id.* at 216-19.) In particular, Givens was lauded for his performance on the Clipper Line account during the transition period

---

[58]       Any suggestion that English was not qualified for the company clerk jobs would be doomed, given that he had amassed substantial experience as a company clerk (including both checker and bookman duties) during his two decades of experience. More importantly, CSA's Assistant Chief Clerk, John Hayes, stated at the March 2004 hiring meeting that either English or Gerry Givens could perform the company clerk duties. (Smith Dep., at 213.) Hayes "made the simple statement he thought either one of them could do the job," and Smith had no reason to disagree. (*Id.* at 214.) The record in the light most favorable to plaintiff clearly shows that he was qualified for the March 2004 position that was awarded to Givens.

[59]       Because Smith himself had limited knowledge of the performance of Givens and English, he based his hiring decision primarily on the observations and recommendations of other meeting attendees. (Smith Dep., at 218.)

-35-

of fall 2000 through fall 2001, and was deemed to have done an excellent job in handling a very difficult account.  (*Id.* at 225.)[60]  By contrast, the CSA decisionmakers viewed English as a "capable clerk," but one who had neither distinguished himself nor demonstrated the skill, initiative and ability that Givens had shown as bookman/clerk-in-charge on the Clipper Lines account.  (Hirsch Decl., ¶ 13; Roberts Decl., ¶ 3.)  In Hirsch's words, Givens was considered to be "heads and shoulders above" the other two applicants, English and Paul Smith (who was white and younger than both Givens and English).  (Hirsch Decl., ¶ 22.)  CSA plainly has produced evidence of a legitimate nondiscriminatory reason for the contested hiring decision.

Yet again, it is a struggle to glean plaintiff's pretext argument from his 30-page memorandum of law.  Among the apparent bases for English's pretext claim which the Court has plucked from scattered locations in his brief are the following: (a) Smith's lack of knowledge of English's bookman experience and skills; (b) English's higher seniority level than Givens, the self-professed "bottom man in the union"; (c) CSA's alleged lack of knowledge of Givens' bookman work on the Clipper Line account, and Hirsch's reliance on hearsay in evaluating Givens' work; (d) the violation of English's alleged recall rights by hiring Givens; (e) Smith's alleged comment at the grievance hearing regarding younger employees; and (f) CSA's history with respect to black employees generally, and English specifically.  (Plaintiff's Brief, at 10, 13, 18, 23, 26-29.)  Considered individually and collectively, these contentions do not furnish the requisite "significantly probative evidence showing that the asserted reason is merely a pretext for discrimination."  *Clark*, 990 F.2d at 1228.

---

[60]      A particularly glowing endorsement of Givens came from Hirsch, who had observed Givens' work on the Clipper Lines account, and found him to have performed his duties exceptionally well and to have demonstrated a great deal of initiative and motivation. (Hirsch Decl., ¶ 10.)  In Hirsch's eyes, Givens "demonstrated excellent communication skills in dealing with customer representatives, suppliers and shipping agents, and he exhibited a great deal of initiative in organizing, taking control of and performing all aspects of a difficult piece of work.  He worked well with others and did an excellent job directing other clerks."  (*Id.*, ¶ 11.) Hirsch indicated that he had "personally witnessed Givens take control of a difficult carrier and successfully fulfill the customer's requirements."  (*Id.*, ¶ 12.)  This skill set was deemed particularly desirable for the new company clerk position, which would require the employee "to perform bookman/clerk-in-charge duties for various shippers at various piers at various times" and would therefore place a premium on "the ability to adapt quickly to various shippers' requirements."  (*Id.*, ¶ 21.)

Plaintiff's assertion that CSA managers lacked personal knowledge of English's and Givens' respective skills and abilities is unsupported by the evidence, and is in fact directly contradicted by the well-developed record on summary judgment. Smith's relative lack of personal knowledge on this topic is unremarkable, given his testimony that he relied on the recommendations and observations of other managers in making the hiring decision. (Smith Decl., ¶ 2; Hirsch Decl., ¶ 22.) And Hirsch's Declaration expressly avows personal knowledge of the work of both Givens and English. (Hirsch Decl., ¶¶ 10, 12, 13.)[61] English may wish that CSA had researched the applicants further before making this hiring decision. Perhaps it would have been prudent or advisable for CSA to do so; however, this Court is not here to decide whether defendant's decision to hire Givens was wise or prudent, or whether he had been sufficiently vetted before that hiring decision was made. *See Chapman*, 229 F.3d at 1030 (one "reasonably may disagree about whether an employer acted correctly or fairly, but such potential disagreement does not, without more, create a basis to disbelieve the employer's explanation").

Likewise, plaintiff's argument that he was more qualified than Givens because he possessed more seniority than Givens in no way signifies pretext. CSA's unchallenged evidence is that the hiring decision in question was not based on straight seniority, and that seniority was "not as significant as demonstrated job performance with regard to bookman/clerk-in-charge jobs." (Hirsch Decl., ¶ 23; Smith Decl., ¶ 2.) English may well disagree with CSA's relative weighting of seniority and performance in the hiring calculus, but such disagreement, without more, cannot demonstrate pretext. *See Cofield*, 267 F.3d at 1269 (refusing to second-guess employer's decision to emphasize qualifications over length of service).

On the topic of recall rights, English contends that there was an industry practice under

---

[61]     That Hirsch also references information he had received about Givens from third parties is in no way is suggestive of pretext, nor is it disqualified as hearsay. If Hirsch heard from others that Givens was an exceptional performer, and if he relied on that information in recommending Givens for hire, then the information in question is not hearsay because it is not being offered for its truth (*i.e.*, that Givens was in fact an exceptional performer), but instead to show Hirsch's state of mind (*i.e.*, his good-faith belief that Givens was an exceptional performer). It is Hirsch's subjective understanding, and not whether Givens was actually a superb worker, that is relevant to the pretext analysis. It is not a violation of Title VII, § 1981, or the ADEA for an employer to err in its assessment of a worker's skills and abilities.

which employees laid off due to loss of business would be called back in order of seniority, rather than being supplanted by new employees.  (English Decl., at 7.)  Because Givens was chosen instead of him, English reasons, his recall rights were violated, which in and of itself raises an inference of discrimination.  There is no evidence, however, that CSA ever ascribed to, adopted or honored that purported "industry practice."  CSA managers, and Union officials, emphatically denied that the company had ever followed such a recall procedure.  (Hirsch Decl., ¶ 15; Smith Dep., at 198-99; Bowden Dep., at 25-26, 78-79.).[62]  At his deposition, English himself could not name a single instance in which a CSA company clerk had ever been recalled, and there were several examples to the contrary (including both English and a white clerk, Forrest duBruyne).  (English Dep., at 335-37.)  Absent evidence that CSA ever adopted or followed this purported "industry practice," its failure to do so in English's case is not probative of pretext.

Next, English asserts that a statement made by Smith during the grievance hearing could prompt a reasonable factfinder to conclude that CSA's stated reasons for not hiring English for the company clerk position were a pretext for age discrimination.  According to English, Smith

---

[62]     Union president Mike Bowden's testimony on this subject is particularly illuminating in establishing that CSA did not observe such recall rights.  Bowden testified as follows:

> "Q:     Has CSA ever called back anyone?
> "A:     No.
>                *                      *                      *
> "Q:     Nobody has ever been called back?
> "A:     Never.
> "Q:     As far as you know?
> "A:     As far as I know.
> "Q:     Do you know of any policy concerning callbacks?
> "A:     We don't have it in our contract, any policy as far as being laid off and being called back, no.
> "Q:     So if somebody said there was a callback policy, they would be mistaken?
> "A:     Yes.  There is in other unions but not in ours."

(Bowden Dep., at 25-26.)  As far as the Union was concerned, then, CSA had no obligation to recall English to the next available vacancy after his January 2002 layoff, and its failure to do so is in no way proof of pretext or discrimination.

-38-

said "that CSA was looking at younger employees and he didn't hire Paul Smith because he was too young or something like that, he said.  I'm not sure of the facts."  (English Dep., at 207.) Age-related comments made by a decisionmaker close in time to a challenged personnel decision and relating to that decision may constitute a sufficient showing of discrimination.  *See, e.g., Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir. 2003) (under stray remarks doctrine, comment provides sufficient evidence of discrimination if it is "(1) age related, (2) proximate in time to the termination, (3) made by an individual with authority over the termination, and (4) related to the employment decision").  The problem is this: English's account of Smith's statement is too nebulous, too ambiguous, too indefinite, and too amorphous to cast doubt on CSA's stated reason for hiring Givens.  To say that CSA was "looking at younger employees" in some generic sense is not the same as saying that English is too old or that the 46-year old Givens was hired because he was younger than the 58-year old English. Besides, English says that Smith immediately followed up this comment by stating that the 31-year old Paul Smith was "too young," which suggests that, if anything, the company was slanted against under-40 employees.  To further confound matters, English followed up this testimony with a backpeddling disclaimer, "I'm not sure of the facts."  Even accepting English's testimony as 100% true, the fuzzy, ill-defined evidence of Smith's statement at the grievance hearing is far too slender a reed to support a pretext finding.

Finally, plaintiff maintains that CSA's history of unfavorable treatment to English and its hiring history with respect to black company clerks generally is evidence from which a reasonable factfinder could disbelieve the company's stated reason for not hiring English as a company clerk in March 2004.  But nothing in CSA's treatment of English over time is indicative of race or age discrimination.  He was hired as a company clerk in September 2000, when CSA commenced operations in Mobile.  He and two white company clerks were laid off in January 2002 based on lost business, and the layoff was conducted in strict accordance with the Union Working Agreement.  He continued working as a freelance clerk and was considered for company clerk vacancies in June 2002 and March 2004.  He was hired as a company clerk in May 2006.  Nothing in this history is indicative of a pattern and practice of invidious discrimination directed at English.  As to CSA's history more globally, English makes much of the fact that no other black company clerks have been hired; however, he identifies only one

-39-

other African-American (Carlis Howze) who has ever applied for a company clerk position at CSA. Although that individual was rejected, there is no evidence before this Court from which a reasonable factfinder could conclude that CSA's treatment of Howze was in any way discriminatory on the basis of his race. These arguments do not show pretext.[63]

For all of these reasons, plaintiff's § 1981, Title VII, and ADEA claims arising from the March 2004 hiring decision are due to be, and the same hereby are, **dismissed** for lack of evidence that such decision was predicated on unlawful age or race discrimination.

### F.    The State Law Outrage Cause of Action.

Although he omits mention of it in his summary judgment filings, plaintiff also brings a state-law claim of outrage against CSA.

While Alabama courts do recognize this tort, they have deemed it a "very limited cause of action that is available only in the most egregious circumstances." *Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1044 (Ala. 1993) (noting that the Alabama Supreme Court "has held in a large majority of the outrage cases reviewed that no jury question was presented"); *see also House v. Corporate Services, Inc.*, 882 F.Supp. 161, 165 (M.D. Ala. 1995) ("the Alabama Supreme Court is not predisposed to recognize that tort of outrage claims present jury questions"). So circumscribed, in fact, is the reach of the tort of outrage that the Alabama Supreme Court has allowed such claims only in three limited circumstances: "cases having to do with wrongful conduct in the context of family burials; cases where insurance agents employed heavy-handed, barbaric means to coerce a settlement; and cases involving egregious sexual harassment." *Carter v. Harris*, 64 F. Supp.2d 1182, 1194 (M.D. Ala. 1999) (citing *Thomas*, 624 So.2d at 1044).

A plaintiff attempting to prove the tort of outrage bears a heavy burden. *See Ex parte Crawford & Co.*, 693 So.2d 458 (Ala. 1997). To withstand summary judgment, the plaintiff

---

[63]    Plaintiff also argues that a jury question is presented on the reasons for English's nonselection because the evidence supports a reasonable inference "that CSA perceptions were due to subliminal race based and/or age based notions of performance capacities." (Plaintiff's Brief, at 29.) The record is devoid of evidence that might reasonably support such an inference. To the extent that CSA downgraded English in assessing his qualifications, the record plainly reflects that such actions were based on CSA managers' actual observations, not some stereotyped, "subliminal" notion of what older black workers were or were not capable of doing.

must make a showing that the defendants engaged in conduct "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *American Road Service Co. v. Inmon*, 394 So.2d 361, 365 (Ala. 1980). Alabama courts have strictly enforced the *Inmon* test.

Thus, a plaintiff claiming outrage must show: "(1) that the defendant's conduct was intentional or reckless; (2) that it was extreme and outrageous; and (3) that it caused emotional distress so severe that no reasonable person could be expected to endure it." *Crawford*, 693 So.2d at 460. Plaintiff has failed to come forward with evidence and argument to support any of these elements. He has not shown that CSA passed over him in March 2004 with the intent to cause him emotional distress.[64] He has not presented any argument or authority that Alabama law might deem the failure to hire a freelance clerk into a regular clerk position for nondiscriminatory reasons to constitute the sort of egregious circumstances necessary to support a claim of outrage. And he has offered not one scrap of evidence that English sustained emotional distress as a result of not being hired in March 2004. This Court will not make the plaintiff's arguments for him. On this showing, no reasonable finder of fact could enter a determination in English's favor on his outrage claim. *See generally Wyant v. Burlington Northern Santa Fe R.R.*, 210 F. Supp.2d 1263, 1295 (N.D. Ala. 2002) (granting employer's motion for summary judgment on outrage claim in sex discrimination context where there was no evidence that defendants intended to cause plaintiff severe emotional distress, the alleged discriminatory conduct was not sufficiently outrageous to support a claim, and she had not shown requisite level of emotional distress). Accordingly, the outrage cause of action is **dismissed**.

**VI.    Conclusion.**

For all of the foregoing reasons, the Court finds that there are no genuine issues of

---

[64]    The statute of limitations for the tort of outrage under Alabama law is two years. *See, e.g.,* Ala. Code § 6-2-38(*l*); *McLean v. Wheaton Van Lines, Inc.*, 842 So.2d 673, 676 n.3 (Ala.Civ.App. 2002); *Archie v. Enterprise Hosp. and Nursing Home*, 508 So.2d 693, 695 (Ala. 1987) ("we hold that the tort of outrage or intentional infliction of emotional distress is governed by the two-year statute of limitations found in § 6-2-38(*l*)"). As such, any outrage claim relating to the 2002 personnel decisions would be untimely, and plaintiff's outrage claim is confined on its face to the 2004 hiring decision.

material fact and that defendant is entitled to entry of judgment in its favor as a matter of law. As such, the Motion for Summary Judgment (doc. 45) is **granted**, and plaintiff's claims are **dismissed with prejudice**.  A separate judgment will enter.  The Motion to Strike (doc. 60) is **granted in part** and **denied in part** as set forth *supra*.

DONE and ORDERED this 21st day of August, 2006.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE